UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------

SUZAN MUZAFAR,

                                 Plaintiff,

               -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION; JEAN WOODS POWELL,
Principal of Information Technology High School;
NATALIE BOUSIGARD HYDE, Assistant
Principal; and ELICIA RODRIGUEZ, Assistant
Principal,

                               Defendants.

------------------------------------------------------------------

**COMPLAINT**

26 Civ.

**JURY TRIAL DEMANDED**

Plaintiff SUZAN MUZAFAR, by her attorneys, GLASS & HOGROGIAN LLP, as and for her Complaint against Defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff brings this action seeking monetary and equitable relief based upon Defendants' violations of 42 U.S.C. Section 1983 and New York Civil Service Law Section 75-b (hereinafter "CLS § 75-b") as a result of retaliatory harassment, adverse employment actions, and the creation of a hostile work environment taken against her as an English teacher employed by Defendants at Information Technology High School in Queens, New York.  This retaliation commenced after she reported, both internally and to entities outside the NYCDOE, concerns about administrative misconduct, including fraudulent student grading practices,

1

improper student course placements, and violations of educational protocols at her presently assigned school at Information Technology High School in Queens, New York.

2.      Plaintiff seeks economic and compensatory damages and punitive damages to the extent allowable by law, and other appropriate legal and equitable relief pursuant to federal, state, and city law.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 as this matter involves federal questions.

4.      This action's venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391, because the events giving rise to this action occurred at Information Technology High School in Long Island City, New York.

5.      This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      This Court has supplemental jurisdiction over Plaintiff's state and city law claims under 28 U.S.C. § 1367(a).

7.      Plaintiff has served a Written Verified Notice of Claim on Defendants regarding her state and city law claims, which has not yet been adjusted to date.

## PARTIES

8.      Plaintiff is a resident of the State of New York and has been employed as an English teacher by Defendant New York City Department of Education ("NYCDOE") since September 2018.

9.      At all times relevant herein, Plaintiff was a "public employee" of Defendants within the meaning of New York State Civil Service Law § 75-b(1)(b).

10.     At all times relevant herein, Defendant NYCDOE was a "public employer" within the meaning of New York State Civil Service Law § 75-b(1)(a).

11.     At all times relevant herein, Defendant Jean Woods Powell was and is the Principal of Information Technology High School, a school within the NYCDOE.

12.     At all times relevant herein, Defendant Natalie Bousigard Hyde was and is an Assistant Principal of Information Technology High School, a school within the NYCDOE, and is Plaintiff's direct supervisor.

13.     At all times relevant herein, Defendant Elicia Rodriguez was an Assistant Principal of Information Technology High School, a school within the NYCDOE.

## STATEMENT OF FACTS

14.     Ms. Muzafar is a tenured pedagogue employed by Defendant NYCDOE as an English teacher, teaching mostly upper-level and Advanced Placement (AP) classes.

15.     Prior to her assignment at Information Technology High School ("ITHS") in Long Island City, Queens in September 2024, she taught English at the Academy of American Studies, where she received stellar teaching observations from September 2022 and June 2024.

3

16.     Before joining ITHS as a full-time teacher in September 2024, she taught summer school sessions beginning in July 2021 and evening p.m. classes beginning in 2022 at the ITHS school under AP Hyde. For these teaching sessions, she received only "Satisfactory" ratings, the highest available for summer programming, from AP Hyde.  AP Hyde asked her to join the school full-time in June 2024.

**2024-25 School Year**

17.     Throughout the 2024-2025 school year, AP Hyde observed her twice–first, on November 15, 2024, and then on March 26, 2025. In both of these teaching observations, AP Hyde gave her ratings of only "highly effective" and "effective" in all categories.

18.     In Ms. Muzafar's first year at ITHS, her students earned the highest proportion of passing scores on the AP English Literature exam in the history of ITHS.

19.     At the close of the 2024-2025 school year, Ms. Muzafar was planning to give student "M.H." a failing grade in her AP English Literature class. The student had consistently failed to complete assignments in a satisfactory manner, averaging 55.6% on formative assessments, 60.5% on homework, 56.4% on participation, and 83.4% on summative assessments.  A grade below 65% is usually recognized as one that fails to pass in the DOE.

20.     Upon information and belief, ITHS has an implicit practice of enrolling students in rigorous, college-level classes for which they are not prepared. Often, these students perform poorly, and when this happens, the school's administration often pressures faculty to give these students unearned passing grades. M.H. was one such student.

21.     Ms. Muzafar had already given M.H. a reasonable chance to make up work that would allow him to pass her class, but he failed to do so.   In a June 12, 2025, conversation with

M.H., the social worker Engy Hanna, and Ms. Muzafar, outside of Ms. Hanna's office, M.H. verbally acknowledged that he was given an opportunity to complete the work and did not do so, and recognized his failure to pass Ms. Muzafar's class as a breach of his own responsibilities.

22.     Subsequent to that conversation with M.H. and Ms. Hanna, Ms. Muzafar requested a meeting later that day with AP Rodriguez after she learned that AP Rodriguez had told M.H. to complete work on google classroom so that he could pass Ms. Muzafar's class.  Ms. Muzafar then asked AP Rodriguez and AP Hyde the same day for clarification why M.H. was asked to do this work.   At that meeting, AP Hyde stated to Ms. Muzafar that he "had to be given something."  Ms. Muzafar then said she had an alternate assessment planned for M.H.

23.     Following that June 12, 2025 meeting, Ms. Muzafar instructed M.H. to attend "boot camp," an end-of-year week-long session where struggling students receive one final opportunity to complete their work.  M.H. attempted to make up his unfinished work during the "boot camp" during Regents week, but failed to do so satisfactorily to earn a passing grade.

24.     At the end of the 2024-25 school year, Ms. Muzafar had entered a failing grade for M.H. into Jupiter, the online gradebook system used by ITHS.

25.     On June 23, 2025, Ms. Muzafar left school early and was not able to return to school for the balance of the school year due to personal illness.   She did not work in the Summer of 2025.

26.     Shortly thereafter, upon information and belief, an unknown administrator converted M.H.'s grade to a passing one without Ms. Muzafar's knowledge or consent.

**2025-26 School Year**

27.     When she returned to school on or about September 2, 2025, at the beginning of the 2025-26 school year, Ms. Muzafar learned that M.H. had been given a passing grade in her class.  Ms. Muzafar started to investigate with other colleagues how this had occurred.

28.     Ms. Muzafar sent Principal Woods an email on September 9, 2025, inquiring about the grade change.  She received no response from Principal Woods for a full month.

29.     After pressing Principal Woods about the reason for the grade change to M.H.'s grade, she received three threatening disciplinary letters for the first time from the school administration, the first on September 29, 2025, and the other two on October 6, 2025.  All of these letters concerned allegations involving M.H. and/or the academic grading policy, for which she had been called to three disciplinary meetings about on September 3, 2025, the first week she had returned to the school.

30.     When she followed up via email with Principal Woods on October 8, 2025, Principal Woods eventually responded via email to her on October 14, 2025, telling her to schedule an appointment with her.

31.     At that meeting, finally scheduled on October 24, 2025, Principal Woods informed Ms. Muzafar that her supervisor, AP Hyde, had informed her that M.H. had not received sufficient opportunity to make up work by Ms. Muzafar, and that they had received permission from the Superintendent to let him make up the work, which ultimately allowed M.H. to receive a passing grade.  Ms. Muzafar informed Principal Woods that what AP Hyde had told her was inaccurate about M.H.'s opportunity to make up work, but Principal Woods stated she would not address the issue further.

32.    On October 23, 2025, Ms. Muzafar learned at a C-6 department meeting that administration had removed her from *per session* and leadership roles, such as Department Lead and DataWise committee membership. The loss of the Datawise committee membership role has caused her to lose *per session* compensation as a result of losing this position. Ms. Muzafar had these roles the previous year, but learned at the meeting that these roles were given by administration to a colleague Jamie Brown instead.

33.    In response to the grade change for M.H., which she believed exemplified ITHS's pattern and practice of enrolling unqualified students in advanced classes and giving them unearned passing grades, Ms. Muzafar submitted formal complaints to the New York City Special Commissioner of Investigation (SCI)[1] and to the College Board, the entity responsible for overseeing the AP curriculum, on or around November 1, 2025.  Her SCI and College Board complaints addressed the school not properly programming students and placing students in AP classes which were not suitable for them.

34.    On November 12, 2025, mere days after Ms. Muzafar submitted these external reports outside her chain of command, Principal Woods observed Ms. Muzafar's AP class and issued her an observation report, dated December 10, 2025, in which she received almost all "Developing" ratings - the first time in her years at ITHS that she had received such low ratings.  On or about December 12, 2025, Ms. Muzafar submitted an Annual Professional Performance Review (APPR) Complaint challenging her November 12 observation as retaliatory and procedurally improper, which is still pending to date.

---

[1] The Office of the Special Commissioner of Investigation (SCI) is the independent watchdog for the New York City school district,

35.     On November 24, 2025, AP Rodriguez summoned Ms. Muzafar to attend a disciplinary meeting the next day on November 25, 2025 with her union representative.  In this disciplinary meeting, AP Rodriguez reprimanded her for her grading practices, including how she grades students and which staff members have access to her assignments. In response, Ms. Muzafar reminded AP Rodriguez that the administration, along with her co-teacher, had had access to every unit of information pertaining to students' grades and assignments since January 2025.

36.     The same day as this disciplinary meeting on November 25, 2025, Ms. Muzafar later learned that the school social worker, Engy Hanna, who maintains very close social ties to several members of the school's administration including Principal Woods, had sent Principal Woods an email complaining about Ms. Muzafar.  In that email, Ms. Hanna claimed, *inter alia*,  that Ms. Muzafar told her students that if they complained about her to anybody, she would not allow them to seek counseling and support from social worker Hanna.

37.     Ms. Muzafar learned about Ms. Hanna's email at a disciplinary meeting called by Principal Woods against her on January 14, 2026.  At this disciplinary meeting, Principal Woods told Ms. Muzafar that she was instructed by DOE legal that she had to forward social worker Hanna's email about her to the DOE Office of Special Investigations (OSI).  Ms. Muzafar stated that the elements of Ms. Hanna's email pertaining to her supposed tendency to contribute to a hostile work environment were entirely untrue.  Ms. Muzafar has not heard from OSI to date, but has received an email from March 2, 2026, from an SCI investigator that her whistleblower retaliation complaint is under continued investigation.

38.     On or about January 23, 2026, Ms. Muzafar learned that the administration removed all students with IEPs from her AP Literature class for the new semester and placed them in an untenured teachers AP Literature class.

39.     On January 29, 2026, Ms. Muzafar discovered from fellow colleagues that she was entitled to pay for a certain pm school position and SBVL course on a pro rata basis.  She promptly requested that relevant paperwork be provided to her by the school administration, but the administration delayed providing her the relevant paperwork, causing her to not be able to timely grieve to obtain this compensation.

40.     On March 11, 2026, Principal Woods called Ms. Muzafar to another disciplinary meeting concerning her grading practices after she had sent an email to Principal Woods on March 6, 2026, complaining about a colleague who falsely claimed she was causing problems about the school's grading practices.  At that meeting, Principal Woods falsely accused her of curving grades in the Jupiter system for the Fall 2025 and violating student privacy.  This caused Ms. Muzafar to have a panic attack, which caused her to leave school for the remainder of the school day.

41.     Following that meeting, Ms. Muzafar learned from the Jupiter system support team that administrators and other employees had been regularly accessing her gradebook without her knowledge in the Jupiter computer system.  These logins occurred at least 40 times by different administrators and employees at the school since June 2025.

42.     On March 16, 2026, Ms. Muzafar spoke to her fall semester co-teacher, Liberto Rollon, in regards to these changes to her students' grades for the Fall 2025, and learned that it was Mr. Rollon who had modified or curved these grades in the Fall 2025.  The following

day, on March 17, 2026, at a meeting in front of 5 colleagues, Ms. Muzafar informed AP Hyde of Mr. Rollon's role in the curving or changing of the grades.

43.     On March 31, 2026, Ms. Muzafar had another disciplinary meeting with AP Hyde and AP Brudasca about leaving early for the panic attack on March 11, 2026, and another allegation regarding disagreement with a colleague.   The same day, Principal Woods acknowledged after "due diligence: that Mr. Rollon told her he curved the students' grades in Ms.  Muzafar's class, under Ms. Muzafar's name.

44.     The relentless retaliation, in the form of multiple disciplinary meetings, disciplinary letters, a poor observation, and loss of per session assignments,  has caused Ms. Muzafar severe emotional distress, including a panic attack on March 11, 2026, which forced her to leave work. She has been compelled to re-enroll in therapy this school year and adopt a regimen of prescription drugs to manage the psychological consequences of the events described above.

## FIRST CLAIM FOR RELIEF

## RETALIATION FOR EXERCISING FREEDOM OF SPEECH IN VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS (42 U.S.C. § 1983)

45.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

46.     Under 42 U.S.C. § 1983, a public employee establishes a *prima facie* case of First Amendment retaliation by demonstrating that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.

47.    In complaining to SCI, Ms. Muzafar complained to an outside governmental authority in an attempt to petition the government for the redress of grievances.

48.    Ms. Muzafar's reports to SCI and the CollegeBoard were made as a citizen, not pursuant to her official duties. Ms. Muzafar communicated with SCI and the CollegeBoard in a manner in which citizens would typically communicate with those entities. Her speech had a clear 'civilian analogue,' as any member of the public can report fraud and educational misconduct to these oversight bodies. Her speech was not an 'employee grievance' but a disclosure of her experiences with systemic fraud, which in matters of public education are clearly of paramount public concern. Therefore, Ms. Muzafar satisfies the first element of the *prima facie* case.

49.    Defendants took adverse employment actions against Ms. Muzafar, which included a poor evaluation, a high frequency of disciplinary meetings, and the denial of per-session paid work opportunities.

50.    There is a clear causal connection between the protected speech and the adverse actions, as the retaliation began immediately following Ms. Muzafar's demonstrated concern regarding her administrators' disregard for responsible grading practices.

51.    While acting under color of State Law, Defendants violated Plaintiff's rights under the First Amendment to the United States Constitution by retaliating against her for speaking as a citizen on matters of public concern; namely, fraud, misconduct, and violations of law and educational standards within a public school.

52.    As a direct and proximate result of Defendants' unlawful retaliatory actions in violation of 42 U.S.C. § 1983, Ms. Muzafar has suffered and continues to suffer loss of

income, severe emotional distress, mental and physical anguish, humiliation, and damage to her professional reputation, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

## RETALIATION IN VIOLATION OF NEW YORK STATE CIVIL SERVICE LAW § 75-B

53.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

54.     Under New York Civil Service Law § 75-b(2)(a), a school district "shall not dismiss or take other disciplinary or other adverse personnel action against a [teacher] ... because the [teacher] discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

55.     Over the past calendar year, Ms. Muzafar intimated to her superiors that she was deeply concerned about her school's lackadaisical academic standards and the pressures placed on faculty to adhere to them. Thereafter, she filed formal complaints with SCI and Collegeboard her concerns regarding Information Technology High School's violations of law, rules, and regulations which presented a substantial and specific danger to the public health and safety, thereby engaging in protected activity under New York Civil Service Law § 75-b(2)(a).

56.    Defendants had knowledge of Ms. Muzafar's high likelihood of engaging in this protected activity since they had been the first people she had gone to in her efforts to rectify the institutional misconduct she had observed.

57.    In direct violation of the statute, Defendants retaliated against Plaintiff by subjecting her to adverse "personnel actions" as defined by New York Civil Service Law § 75-b(1)(d). These actions include retaliatory harassment, punitive disciplinary measures, removal of duties and per-session work, negative evaluations, and the creation of an intolerable and hostile work environment as described above.

58.    As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer grievous harm, including loss of income, severe emotional distress, and damage to her professional standing, in an amount to be determined at trial.

## JURY DEMAND

59.    Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor against Defendants, jointly and severally, as follows:

a. A judgment declaring that Defendants' acts violated Plaintiff's rights as secured by the First Amendment, 42 U.S.C. § 1983, and New York Civil Service Law § 75-b;

b. A preliminary and permanent injunction enjoining Defendants from continuing their retaliatory campaign, from imposing any further adverse employment actions against Plaintiff, and from interfering with the terms and conditions of her employment;

c. Compensatory damages for economic loss, emotional distress, pain and suffering, humiliation, and damage to professional reputation, in an amount to be determined at trial;

d. Punitive damages against the individual Defendants;

e. Attorney's fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

f. Pre-judgment and post-judgment interest at the highest allowable rate; and

g. Such other and further relief as this Court deems just and proper.


DATED: New York, New York
        May 1, 2026


                    GLASS & HOGROGIAN LLP
                    85 Broad St., 18th Fl. @ WeWork
                    New York, NY 10004
                    (212) 537-6859

            By:    s/ Bryan Glass
                    Bryan Glass, Esq.

14